UNITED STATES DISTRICT COURT<br>
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | Criminal No. 17-cr-153-2 (JEB/GMH) |
| DANIEL CATERNOR, | ) ) ) | |
| Defendant. | ) ) | |

## DETENTION MEMORANDUM

This matter comes before the Court upon the application of the United States that Defendant, Daniel Caternor ("Caternor"), be detained pending trial pursuant to 18 U.S.C. § 3142. The Grand Jury charges Caternor by Indictment with one count of conspiracy to distribute and possess with intent to distribute one hundred grams or more of heroin in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(i) and 846, and one count of distributing heroin in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). The Court held a detention hearing for Caternor on August 24, 2017. At the conclusion of that hearing and upon consideration of the proffers and arguments of counsel and the entire record herein, the Court ordered Caternor held without bail pursuant to 18 U.S.C. 3142(e).[1] This memorandum is submitted in compliance with the statutory obligation that "the judicial officer shall . . . include written findings of fact and a written statement of the reasons for the detention." 18 U.S.C. § 3142(i)(1). The findings of fact and statements of reasons in support of pretrial detention follow.

---

[1] Another member of this Court granted the government's motion to detain pending trial Caternor's Co-Defendant in this matter, Kwaku Asare ("Asare"), following a detention hearing on August 18, 2017.

**FINDINGS OF FACT**

At the detention hearing, the United States proceeded by proffer based on the Indictment. The defense offered no contrary evidence on the merits of the offense, nor challenged any aspect of the government's factual proffer. Accordingly, the Court makes the following findings of fact regarding the government's allegations.

### A. The Government's Investigation

Caternor, a citizen of Ghana and a lawful permanent resident of the United States, has been accused of conspiring to traffic and actually trafficking large quantities of heroin in the Washington, D.C. area with Asare, his Co-Defendant.[2] According to the government's proffer, the Federal Bureau of Investigation ("FBI") began investigating Caternor in April of 2016. On April 12, 2016, a cooperating witness ("CW") purchased approximately twenty-five grams of heroin for $2,250 from Caternor at the direction of the FBI. The FBI captured both an audio recording and video surveillance of this transaction, observing Caternor drive into a parking lot in Maryland, exit his car and enter the CW's parked car in the same lot, and then exit the CW's car and drive away in his car. During the transaction, Caternor told the CW that he was interested in selling larger quantities of heroin, explaining that selling smaller quantities was less profitable.

Two days later, the CW purchased another twenty-five grams of heroin from Caternor in the same location. Audio recording and video surveillance of this transaction show Caternor pulling into the parking lot in the same car as before, exiting that car, and entering the CW's parked car. In the CW's car, Caternor handed the CW a plastic bag containing an off-white powdery substance in exchange for $2,000. Caternor again expressed a desire to sell larger amounts of narcotics, explaining to the CW that if he was selling less than "50"—meaning less than fifty grams

---

[2] The Court will include a description of the government's entire investigation to provide a complete picture of the events that led to Caternor's conspiracy charge.

of heroin—then the sale was not worth his time. Caternor then exited the CW's car and drove away. The powdery substance that Caternor sold to the CW tested positive for opiates.

On May 5, 2016, the CW called Caternor to arrange another heroin purchase. On the call, which the FBI recorded, Caternor referenced the prospect of the CW purchasing "50 doors," which law enforcement believes is a term used to refer to fifty grams of heroin. The next day, FBI captured audio recording and video surveillance of Caternor and the CW meeting in the same parking lot. Caternor arrived in a different car, parked next to the CW, and entered the CW's car. While in the CW's car, Caternor told the CW that a male—later identified as Asare—was sitting in another car across the parking lot, and that the man was Caternor's associate. Caternor told the CW that Asare would be able to sell the CW drugs in the future if he was unavailable. According to the government's proffer, Caternor then spoke to Asare, who had apparently exited his car, through the window of the CW's car in a foreign language, and Asare tossed a plastic bag containing a tan, powdery substance into the CW's car. In exchange, the CW gave Caternor $4,000. Additionally, Caternor informed the CW during this transaction that the CW could purchase the same quantity of heroin in the future by sending him a text message containing the terms "doors" or "50." After Caternor and Asare left the parking lot, law enforcement tested the substance that Asare tossed into the CW's car and determined that it tested positive for opiates.

The CW called Caternor to arrange another heroin purchase on September 15, 2016. During the recorded call, the CW and Caternor reached an agreement in which the CW could purchase 100 grams of heroin for the price of seventy-five grams, with the understanding that the CW would pay for the additional twenty-five grams within a week of the initial transaction. To complete the purchase, Caternor instructed the CW to meet an unknown individual at a Costco in Washington, D.C. At 11:15 AM that day, the CW drove into the Costco parking lot and parked while FBI

3

agents surveilled him. Another individual, later identified as Asare, arrived in a black sedan and parked next to the CW. Asare then got out of his car and got into the CW's car. Audio recording of the interaction establishes that the CW gave Asare $6,000 in exchange for a bag containing a powdery substance. Caternor was listening to this transaction through the CW's car's speaker system, having previously called the CW's cell phone. After the transaction, the CW confirmed that Asare was the seller, and law enforcement determined that the substance was heroin.

On January 12, 2017, the CW called Asare at the direction of law enforcement to arrange a time to meet so that the CW could purchase "50 doors," meaning fifty grams of heroin. The next day, the two met in the same Costco parking lot. Law enforcement observed Asare park next to the CW's car, get out of his car, and enter the CW's car. During the transaction, Asare told the CW that he thought the CW was interested in discussing business only, so no transaction occurred. To make up for the misunderstanding, Asare told the CW that he would "front" an additional thirty grams of heroin at the next transaction.

Less than a week later, on January 18, 2017, the CW sent Asare a text message asking to meet on January 24, 2017 to purchase heroin. Based on their previous discussion, the CW agreed to purchase fifty grams of heroin with the understanding that Asare would provide the CW with an additional thirty grams of heroin that the CW would pay for at a later date. The two met at the same Costco parking lot as before on January 24, 2017, and audio recording and video surveillance of their interaction establishes that the CW handed Asare $4,000 in exchange for a plastic bag containing an off-white, powdery substance. A subsequent analysis of the substance revealed that it was approximately seventy-nine grams of heroin. On February 9, 2017, the CW met Asare at the same parking lot and provided him with $2,400 for the additional thirty grams of heroin that Asare supplied on January 27, 2017, consistent with their agreement.

On April 4, 2017, the CW received a text message from Asare asking "[h]ow many doors," meaning grams of heroin, the CW wanted to purchase. The CW requested to speak with Asare instead, and the two met in the Costco parking lot that same day to discuss the possibility of the CW purchasing 500 grams or more of heroin. According to the government's proffer, Asare agreed to provide the CW with 500 grams of heroin and offered to "front" the CW an additional 200 grams of heroin, which the CW would pay for on a later date. At one point during this meeting, Asare called an unknown individual using the FaceTime feature on his cell phone and the two spoke in Twi, a Ghanaian language. Based on a translation of that conversation, which law enforcement recorded, Asare told the individual that the CW was attempting to gather the funds to purchase "one kilo." The individual on the phone instructed Asare to ask the CW when the CW would be ready to make that purchase, and the CW explained that it would be a few weeks before the CW could gather enough money. The CW asked Asare how much a kilo of narcotics would cost, suggesting "seventy," and Asare responded "yeah."

On July 6, 2017, the CW arranged to meet with Asare on July 11, 2017 through text messages to purchase 100 grams of heroin. One of the CW's text messages read "130 same spot…near gas station. My truck will need a 100 in gas…lol," to which Asare responded "Ok." The two met on July 11, 2017 to complete the transaction, and law enforcement surveilled the meeting. The CW informed Asare that the CW only had "4," meaning $4,000, and that the CW would pay for the rest of the narcotics the following week. Asare agreed to that arrangement and told the CW that he brought with him 150 grams of heroin, which he gave to the CW for $4,000. According to the government's proffer, Caternor supplied the heroin that Asare sold to the CW. After the transaction, the CW asked Asare if the CW could purchase 700 grams of heroin in August of 2017, and

5

Asare advised that such a transaction would be possible. Asare also told the CW that he was "getting the girls, too," which law enforcement believes was an offer to sell the CW cocaine.

In addition to recording these drug transactions, law enforcement obtained and executed a warrant to search Caternor's apartment as part of its investigation. During the search, law enforcement recovered multiple blank credit cards and a credit card reading machine. Based on the above evidence, a Grand Jury returned an Indictment in August 2017, charging Caternor with one count of conspiracy to distribute and possess with intent to distribute one hundred grams or more of heroin in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(i) and 846, and one count of distributing heroin in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). The undersigned issued a warrant for Caternor's arrest on August 7, 2017, and Caternor was arrested and brought before this Court on August 15, 2017.

### B. Caternor's Criminal History

Caternor's criminal record includes one federal traffic offense in Maryland and a disorderly conduct conviction in New Jersey. With respect to the former, Caternor was charged with driving under the influence after being arrested on April 28, 2015 by United States park police in Rockville, Maryland. With respect to the latter conviction, Defendant was arrested on August 20, 2013 for disorderly conduct and was also charged and convicted with an identity-related crime. According to the government's proffer, the identity-related crime involved an attempt by Caternor to provide law enforcement with a false name during his arrest. Additionally, on June 17, 2011, Caternor was convicted of shoplifting in Virginia.

## LEGAL STANDARD

The Bail Reform Act of 1984, 18 U.S.C. § 3142 *et seq.*, provides, in pertinent part, that if a judicial officer finds by clear and convincing evidence that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any

6

other person and the community, such judicial officer shall order the detention of the [defendant] before trial." 18 U.S.C. § 3142(e). Thus, even absent a flight risk, danger to the community alone is a sufficient reason to order pretrial detention. *United States v. Salerno*, 489 U.S. 739, 755 (1987); *see also United States v. Perry*, 788 F.2d 100, 113 (3d Cir. 1986); *United States v. Sazenski*, 806 F.2d 846, 848 (8th Cir. 1986). Where the judicial officer's justification for detention is premised upon the safety of the community, the decision must be supported by "clear and convincing evidence." 18 U.S.C. § 3142(f). Where the justification for detention is the judicial officer's finding that no set of conditions will assure the defendant's appearance in court, such a decision must be supported by a preponderance of the evidence. *See United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987).

Through the Bail Reform Act, Congress has instructed that a judicial finding of probable cause to believe that a defendant has committed certain types of offenses—including an offense charged under the Controlled Substances Act, codified at 21 U.S.C. § 801 *et seq.*, that carries a maximum term of imprisonment of ten years or more—gives rise to a rebuttable presumption that the defendant constitutes a danger to the community and that no pretrial release condition or combination of conditions may be imposed to reasonably assure the appearance of the person as required or the safety of the community if he were released. *See* 18 U.S.C. § 3142(e)(3)(A); *see also United States v. Mosuro*, 648 F. Supp. 316, 318 (D.D.C. 1986) (holding that a grand jury indictment established probable cause sufficient to create a rebuttable presumption under section 3142(e)).

Once the rebuttable presumption is triggered, it imposes a burden of production on the defendant "to offer some credible evidence contrary to the statutory presumption." *See United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985). As this Court recently emphasized, "[w]hile

the burden of production may not be heavy, the applicable cases all speak in terms of a defendant's obligation to introduce 'evidence.'" *United States v. Lee*, 195 F. Supp. 3d 120, 125 (D.D.C. 2016) (citations omitted). Thus, some actual evidence and not mere speculation must be offered to rebut the presumption. In the face of the presumption, which "reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial," a defendant "should 'present all the special features of his case' that take it outside 'the congressional paradigm[.]'" *United States v. Stone*, 608 F.3d 939, 945–46 (6th Cir. 2010) (quoting *United States v. Jessup*, 757 F.2d 378, 387 (1st Cir. 1985)); *see also United States v. Bess*, 678 F. Supp. 929, 934 (D.D.C. 1988) (finding that the presumption "represents Congress' general factual view about the special flight risks and the special risks of danger to the community presented by defendants who commit the crimes to which it attaches").

That said, the burden of persuasion on the issue of detention remains, as always, with the government. *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001). But even where the defendant offers evidence to rebut the presumption, the presumption is not erased. Rather, the "presumption is incorporated into the other factors considered by this Court in determining whether to grant a conditional release and is given substantial weight." *United States v. Ali*, 793 F. Supp. 2d 386, 391 (D.D.C. 2011); *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986) (recognizing that the section 3142(e) presumption does not disappear when rebutted, but "remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)").

## ANALYSIS

A. **Application of the Rebuttable Presumption**

The government asserts that Caternor is subject to a rebuttable presumption in favor of pretrial detention pursuant to 18 U.S.C. § 3142(e)(3)(A) because the Indictment establishes that there is probable cause to believe that he committed an offense under the Controlled Substances Act—conspiracy to distribute and possess with intent to distribute one hundred grams or more of heroin, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(i) and 846—that carries a maximum term of imprisonment of forty years.[3] Caternor concedes that the presumption in favor of detention applies here, but stresses that his strong ties to the community and brief criminal history are sufficient to rebut that presumption. Accordingly, and in lieu of pretrial detention, Caternor asks the Court to release him on conditions, including electronic monitoring and home detention, to live with a member of his church who has agreed to act as a third-party custodian on his behalf.

Having heard the parties' proffers, the Court finds that Caternor has failed to rebut the presumption raised by the instant charges that he constitutes a danger to the community and that no pretrial release condition or combination of conditions may be imposed to reasonably assure his appearance before this Court if he were released. More specifically, the Court finds that the conditions of release proposed by Caternor would be unsuitable here. Indeed, the Court is unconvinced, based on the record before it, that Caternor's placement at a friend's home would sufficiently reduce the likelihood of his commission of criminal activity or his risk of flight, particularly in light of the seriousness of the charged offenses and the concomitant terms of imprisonment that they potentially carry. After all, if Caternor is found guilty of conspiring to distribute and possess with intent to distribute one hundred grams or more of heroin, he faces a mandatory minimum

---

[3] Defendants charged under 21 U.S.C. § 841(b)(1)(B)(i) face a term of imprisonment of at least five years and up to forty years—or, if certain conditions not present here are satisfied, life.

term of imprisonment of five years with the possibility of a far longer one. Moreover, the undersigned finds that the proposed conditions of release provide an insufficient change in circumstances to ensure that Caternor does not commit additional narcotics-related offenses, which he previously orchestrated by telephone, or flee this jurisdiction. Accordingly, the Court finds that Caternor has not met his burden to produce some credible evidence contrary to the statutory presumption of dangerousness and risk of flight here and, as a result, Congress's assessment of the risk of flight and danger posed to the community by individuals who, like Caternor, have been charged with federal narcotics offenses that carry a maximum term of imprisonment of at least ten years is itself a sufficient reason to hold Caternor without bond pending trial in this matter. *See Alatishe*, 768 F.2d at 371; *see also United States v. Bess*, 678 F. Supp. 929, 934 (D.D.C. 1988) (explaining that the presumption "represents Congress's general factual view about the special flight risks and the special risks of danger to the community presented by defendants who commit the crimes to which it attaches").

### B. Application of the Section 3142(g) Factors

Even if Caternor had rebutted the presumption in favor of detention here, the Court would still find that he should be detained during the pendency of this case. In determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, the Court considers: (1) the nature and circumstances of the offense; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g). Further where, as here, a rebuttable presumption applies, the Court should give the presumption "substantial weight" in the section 3142(g) analysis even if the defendant has met his or her burden of

providing some credible evidence to the contrary. *Ali*, 793 F. Supp. 2d at 291. As demonstrated below, a weighing of all of these factors compels the conclusion that Caternor should be detained pending trial.

1.   *Nature and Circumstances of the Charged Offenses*

The first factor, the nature and circumstances of the charged offenses, favors detention. As described above, the government has established probable cause to believe that Caternor engaged in a conspiracy to distribute and actually distributed heroin. The seriousness of this conduct is reflected in the potentially lengthy term of imprisonment that his charges carry. Moreover, the Court is cognizant that heroin is extremely harmful to the user and to the community, which bears the cost of drug treatment programs and the violence that often accompanies drug use. The government's proffer establishes that Caternor has been involved with trafficking heroin on a large scale—the government alleges that he is a narcotics "wholesaler"—and there is no reason to conclude that he would not have continued to engage in narcotics trafficking had he not been arrested. The evidence further establishes that Caternor very likely has direct access to major sources of heroin and potentially other drugs, and that he was specifically interested in selling larger volumes of heroin than the CW sought to pruchase. Finally, the Court notes that the rebuttable presumption Congress created for Caternor's drug offenses reflects its judgment that persons who commit these offenses pose a substantial threat to the safety of the community. *See* 18 U.S.C. § 3142(e)(3)(A); *Bess*, 678 F. Supp. at 934. Accordingly, the undersigned finds that this first factor calls for detention.

2.   *The Weight of the Evidence*

The weight of the government's evidence also favors detention. Law enforcement has audio recordings and video surveillance of Caternor selling heroin to a CW on multiple occasions.

11

During these controlled drug buys, law enforcement observed Caternor meeting with the CW and providing the CW with narcotics. The evidence also establishes that Caternor wanted to sell larger quantities of heroin to the CW and worked with Asare to achieve this goal. On this evidence, the grand jury found probable cause to believe that Caternor conspired to sell and participated in several heroin sales totaling hundreds of grams of heroin. Caternor provided no evidence and little argument to counter the government's case, and the Court is thus satisfied at this preliminary stage by the Grand Jury's probable cause finding. Whatever contentions Caternor has with the merits of the government's case may be presented to the jury at trial, but, until then, the weight of the evidence favors detention.

   3. *The History and Characteristics of the Defendant*

The history and characteristics of Caternor also favor detention, although not as strongly as the other factors. Section 3142 directs the Court to consider: (1) the defendant's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (2) whether, at the time of the current offense or arrest, the defendant was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under federal, state, or local law. 18 U.S.C. § 3142(g)(3)(A)–(B).

Here, Caternor's criminal history is brief. He was arrested on three prior occasions—once for driving under the influence, once for disorderly conduct, and once for shoplifting. Troublingly, Caternor's disorderly conduct charge was accompanied by an "identity crime," which the government described as Caternor providing law enforcement with a false name during his arrest. More broadly, the Court is concerned that Catenor could easily continue to work as a narcotics trafficker

if permitted to live at his friend's home, since he appears to work with associates by telephone. Placing Caternor in his friend's home would therefore not constitute a special circumstance that might assuage the Court's concern—and Congress' concern, as evidenced by the statutory presumption—about his dangerousness. *See Stone*, 608 F.3d at 945–46. Finally, the Court notes that a search of Caternor's apartment uncovered several blank credit cards and a credit card reader machine, which raises concerns about Caternor's trustworthiness and his conduct beyond the allegations of narcotics trafficking. Thus, while cognizant of Caternor's ties to the community and the support offered to him by his friends and family, the Court does not find that home detention is a reasonable alternative to holding Caternor pre-trial. Caternor has not overcome the presumption of dangerousness and risk of flight associated with his charged conduct and, even if he had, the Court finds that Defendant's history and characteristics weigh in favor of detention.

    *4.       The Danger to the Community*

The fourth factor, the danger to the community, also weighs in favor of detention. As indicated above, the danger to the community posed by the distribution of heroin is substantial and requires little explanation. This is particularly true when considering the amount of heroin associated with Caternor's charged conduct.

**CONCLUSION**

Based upon consideration of all the evidence and the factors set forth in 18 U.S.C. § 3142(g), of the statutory presumption applicable here, and of all less-restrictive alternatives to pretrial detention, this Court finds by clear and convincing evidence that no condition or combination of conditions exist that would reasonably assure the safety of the community if Caternor were to be released, and by a preponderance of the evidence that no set of conditions would assure

Caternor's appearance in court if he were to be released.  Therefore, the government's motion for pretrial detention is granted.


Date:  September 11, 2017         _____
                                  G. MICHAEL HARVEY
                                  UNITED STATES MAGISTRATE JUDGE